IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:13-CT-3193-FL

ANTOINE MONTEZ MILES,                )
                                     )
            Plaintiff,               )
                                     )
      v.                             )                    ORDER
                                     )
DAVID GUICE, GEORGE SOLOMON,         )
GWEN NORVEIL, LARRY DUNSTON,         )
FRANK PERRY, and BETTY BROWN         )
                                     )
            Defendants.              )
                                     )

        The matter is before the court on defendants' motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56(a) (DE 57), which has been fully briefed.  Also before the court

is defendants' unopposed motion to seal (DE 69).  For the following reasons, the court grants

defendants' motions.

## STATEMENT OF THE CASE

        For ease of reference, the background as set forth in this court's February 26, 2015, order

is as follows:

> On August 14, 2013, plaintiff filed this action, *pro se,* pursuant to
> 42 U.S.C. § 1983, against the following defendants:  Commissioner
> for the North Carolina Division of Adult Correction, David Guice
> ("Guice"); Director of Prisons, George Solomon ("Solomon");
> Deputy Director of Prisons, Gwen Norveil ("Norveil"); and Security
> Threat Group ("STG") coordinator, Larry Dunston ("Dunston").  The
> court subsequently permitted plaintiff leave to amend his complaint,
> and notified plaintiff that any amended complaint he subsequently
> filed would constitute the complaint in its entirety.

On November 27, 2013, plaintiff filed his amended complaint adding the following defendants: Secretary of the Department of Public Safety ("DPS"), [Frank Perry ("Perry")] and Director of Chaplaincy Services, Betty Brown ("Brown"). In his amended complaint, plaintiff alleged that defendants violated his rights pursuant to the Free Exercise Clause of the First Amendment to the United States Constitution. Plaintiff also alleged that defendants violated his rights pursuant to the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and the Religious Land Use of Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc-1, et seq. [As relief, plaintiff requests that the court grant the following injunctive relief: remove the STG designation from [Nations of Gods and Earths ("NGE")] NGE; create a policy which would permit Five Percenters to practice NGE; permit plaintiff to receive NGE text including "The Supreme Mathematics," "The Supreme Alphabet," and "120 Degrees;" provide plaintiff a vegan diet; structure plaintiff's meals so that he can fast on NGE holy days; permit plaintiff to receive the NGE newspaper-"The Final Call;" permit plaintiff to possess a medallion or flag; allow plaintiff to participate in celebratory feasts on NGE holy days; and permit plaintiff to receive NGE publications published from NGE publishers. Plaintiff also requests monetary damages pursuant to his Eighth and Fourteenth Amendment claims.]

On April 10, 2014, the court entered an order in which it dismissed Norveil from this action because plaintiff failed to allege facts against Norveil in the amended complaint. The court also allowed plaintiff to proceed with his claims against the remaining defendants.

On July 28, 2014, defendants Brown, Dunston, Guice, Shanahan, and Solomon filed a motion to dismiss plaintiff's action pursuant to Federal Rule of Civil Procedure 12(b)(6) arguing that plaintiff failed to state a claim upon which relief may be granted. Defendants, alternatively, assert the affirmative defense of qualified immunity. The motion was fully briefed.

(DE 45 at 1-2).

On February 26, 2015, the court granted in part and denied in part defendants' motion to dismiss. Defendants' motion was granted as to plaintiff's due process claim, but denied as to

2

plaintiff's remaining claims. The court reserved ruling on the issue of qualified immunity for another day. Plaintiff thereafter filed a motion to appoint counsel, which was denied.

On November 2, 2015, defendants filed the instant motion for summary judgment arguing that plaintiff is unable to establish a constitutional violation. Defendants attach the following documents in support of their motion: personal affidavits from defendants Dunston and Brown; portions of DPS's policies and procedures; excerpts from plaintiff's disciplinary history; plaintiff's DPS Offender Public Information page; plaintiff's offender demographics; and plaintiff's "Inmate Request for Religious Assistance Fact Sheet" and response. Alternatively, defendants assert the affirmative defense of qualified immunity. Plaintiff responded to defendants' motion for summary judgment and attached the following exhibits: his personal declaration; plaintiff's November 27, 2013, complaint; DPS administrative remedy documents; excerpts from NGE publications; excerpts from DPS's policies and procedures; a hand-written note; his "Inmate Request for Religious Assistance Fact Sheet;" prison disciplinary reports; a document summarizing his August 8, 2005, interrogation in connection with his criminal charges; a document captioned "Interrogation-Advisement of Rights;" letters; and personal declarations from inmates Donald Mitchell, Robert Hartgrove, and Meldetric Antonio Rogers-El.

On July 25, 2016, the court entered an order providing defendants the opportunity to supplement their motion for summary judgment in order to address claims they had failed to address in their motion for summary judgment, and to correct evidentiary deficiencies. In response defendants filed a supplemental memorandum, to which they attached the following: supplemental affidavits from defendants Dunston and Brown; plaintiff's DPS offender information page; a memorandum from Khalil A. Akbar, a Regional Clinical Chaplain II; minutes from an October 2,

3

2014, DPS Religious Practices Committee ("RPC") meeting; memoranda regarding plaintiff's STG validation process; United Blood Nation ("UBN") materials found in plaintiff's possession; NGE materials; and the Nation of Islam ("NOI") materials. Defendants also filed the instant motion to seal their exhibits attached to Dunston's supplemental affidavit which contain UBN, NGE, and NOI materials. Plaintiff subsequently filed a response and then a supplemental response.

## STATEMENT OF THE FACTS

Except as where otherwise identified below, the facts viewed in the light most favorable to plaintiff may be summarized as follows. Plaintiff, a state inmate, challenges DPS's "absolute ban" on the practice of NGE, commonly referred to as "Five Percenters" or "The Five Percenters Nation." (Am. Compl. ¶¶ 9, 12; Pl.'s Resp. (DE 62), p. 2). By way of background, the NGE is a group that does not have "an organizational structure or hierarchy[,]" and that is similar to the NOI religion. (Id. ¶¶ 12-18, 23.) Because DPS does not recognize NGE as a religion, plaintiff may not designate NGE as his religious faith preference. (Brown Aff. ¶ 10). Plaintiff, instead, has designated his religious faith preference as Islam. (Id. Ex. B.) As a result, plaintiff may, within the parameters if his custody classification level, possess Islamic literature, request dietary accommodations consistent with the Islamic faith, participate in Islamic feasts, or participate in Islamic religious corporate worship. (Id. ¶¶ 15-16). Plaintiff also maintains the freedom to practice the Islamic faith, while following the teachings, directives, or preferences of NGE. (Id. ¶ 18).

Plaintiff admits that NGE and NOI contain many similarities. For instance, both groups believe that "the white man is the devil made from a process of Eugenics known to both groups as Grafting." (Am. Compl. ¶ 15). NGE and NOI, however, are distinguishable on the ground that NGE permits white inmates to practice its beliefs, while NOI does not. (Id. ¶ 24). Plaintiff states

4

that the NGE is not "anti-white or pro black but anti-devilishment and pro-righteousness." (<u>Id.</u> ¶ 24). NGE and NOI also use the same central texts including "120 Degrees," "Supreme Mathematics," and "Supreme Alphabet." (<u>Id.</u> ¶ 16.) NGE members, however, also study secondary texts including literature published by the "Allah School in Mecca," the "Allah youth Center in Mecca," "The Sun of Man Publications," "Supreme Design Publishing," and "A-Team Publishing." (<u>Id.</u> ¶ 20.) NGE members must study the primary and secondary texts in conjunction "to get a deeper meaning in the teachings." (<u>Id.</u>) In addition to similar publications studied by NGE and NOI, both groups observe the practice of fasting in observance of the holy days. (<u>Id.</u> ¶ 19). NGE members observe the following holy days: (1) the birth and death of NCG founder, Clarence 13x; (2) the birthday of NOI founder W.D. Ford; and (3) the birthday of Elijah Muhammad. (Id.) "Members of the NOI observe the last two Holy days as well." (<u>Id.</u>) "Five Percenters in accords to the NGE belief system in observance of Holy days fast from sunrise till sunset as well as come together and break the fast with a celebratory feast in commemoration of the Holy Ones accomplishments." (<u>Id.</u>)

NGE members also adhere to the same dietary restrictions as NOI members, which consists of "refraining from consuming or using pork or its by-products." (Compl. ¶ 18). According to plaintiff, "[m]ost members . . . choose[] to eschew meat altogether often opting to Veganism to ensure the Dietary restrictions are being adhered to [and] pork or pork products aren't being consumed. This is so because some farmers feed their animals with pork feed as some preservatives that are used contain pork derivatives, so to ensure that pork [and ] its by-products isn't being consumed one opts for a diet that doesn't consist of any animals or animal products." (<u>Id.</u>) In light of these beliefs, plaintiff states that he has been forced to choose between either eating meat or

5

foregoing the meat provided in his regular diet in order to comply with his NGE beliefs. (Id. ¶ 53 and Attach. Ex. B-1). As a result, plaintiff has suffered from "severe migraines headaches, abdominal pain, fatigue, and nausea." (Id. ¶ 63). With a religious designation of Islam, plaintiff has the option of requesting a lacto-ovo vegetarian diet. (Brown Supp. Aff. ¶ 12). Finally, practitioners of NGE wear "medallions which are medals bearing portraits of the NGE Founder as well as medals bearing the 'Universal Flag of Islam' or 'Universal Flag.'" (Am. Compl. ¶ 20).

As for plaintiff's personal relationship with NGE, he began his study of the group's teachings in 2004. (Id. ¶ 10; Dunston Supp. Aff. ¶ 10 and Ex. B).[1] At some point in 2005, plaintiff was arrested and incarcerated at Western Youth Institution. (Dunston Supp. Aff. ¶ 8 and Ex. B). Officials at Western Youth Institution subsequently validated plaintiff as a UBN Level III STG. (Id.) On December 14, 2006, plaintiff was convicted of gang-related charges which included, *inter alia*, murder, assaults inflicting serious injury, and the possession and discharge of firearms. (Id. ¶ 8 and Ex. A). Plaintiff then was transferred to DPS custody. (Id. ¶ 8; www.doc.state.nc.us).


Once in DPS custody, plaintiff received disciplinary infractions for assaulting a person with a weapon, fighting, weapon possession, and involvement with a gang. (Dunston Aff. Ex. B). By 2009, plaintiff had attained the custody classification of High Security Maximum Control ("HCON"). (Dunston Supp. Aff. ¶ 12). On May 30, 2009, plaintiff attacked a correctional officer at Polk Correctional Institution ("Polk") with a box-cutter resulting in injuries to the officer requiring 200 sutures and 25 staples. (Id. and Dunston Aff. Ex. B). A few months later, plaintiff received a disciplinary infraction for possessing a weapon. (Dunston Aff. Ex. B).

---

[1] The court notes that plaintiff was in DPS custody as a youth offender from 2002 through the fall of 2004. (Dunston Supp. Aff. ¶ 8 and Ex. A).

6

DPS, additionally, has experienced incidents of violence from other inmates identifying as members of both the UBN and the Five Percenters. (Dunston Supp. Aff. ¶¶ 7, 19, 20). Specifically, on July 31, 2013, UBN and Five Percenter affiliated inmate Dye assaulted another inmate, from a rival UBN group, with a blade leaving a 14.5 cm laceration to the inmate's face. (Id. ¶ 19). DPS officials subsequently determined that the assault was ordered and sanctioned by members of the UBN. (Id.) Then, on February 5, 2015, at Tabor Correctional Institution ("Tabor"), a Five Percenter inmate named Rogers attempted to assault a correctional officer after refusing the officer's orders. (Id. ¶ 20). As Rogers was being escorted out of the Tabor unit after the assault, he attempted to head-butt the escorting officer, and called the officers a "black devil" and a "white devil." (Id.)

In the interim, defendant Dunston participated in a second STG validation process for plaintiff, which resulted in plaintiff again being validated as a Level III UBN member on October 30, 2011. (Id. ¶ 13 and Ex. C). During the second validation process, plaintiff admitted to being a "triple O" member of the UBN, and was found in possession of 17 pages of UBN materials which contained his handwriting. (Id. and Exs. C, D, E, F.) The form of the UBN documents resemble legal documents, which Dunston attests is a means for inmates to get gang-related materials past prison officials. (Id. Ex. D). Much of the UBN materials confiscated from plaintiff contain coded language and discuss topics such as guns, violence, and gang structure. (Id. Ex. D, pp. 2-4). Additionally, the UBN document entitled "WHO WE BE" states that the UBN will remain united against "wicked families" (a reference to Five Percenter's belief that white men are "wicked") and states "Five is what we stand for." (Id. p. 6).

In addition to the materials confiscated directly from plaintiff, defendant Dunston submitted excerpts from NOI books which discuss texts including "Supreme Mathematics" and "Supreme

7

Alphabet." (Id. ¶ 15 and Ex. E). The materials explain the methodology in the "Five Percent" and explain that, in accordance with their belief system, the "supreme being" is the "Black man of Asia." (Id. pp. 1, 4). The materials also state that black men must work to free themselves of the "confinement of darkness" of the "White man's society and way of living." (Id.) The materials refer to white men as the "devil" and discuss white men in terms of oppressing black men as slaves. (Id. pp. 6, 8). In addition to the foregoing texts, defendant Dunston also submitted excerpts from the NGE newspaper, the "Final Call." (Id. Ex. F). Such excerpts include statements calling for the development of a separate black society, without the inter-mixing of marriages, and states that the races cannot co-exist in peace. (See Id.) Both the UBN and Five Percenter materials contain many overlapping references. (Id. Ex. D, E, F).

Despite the connection between UBN and Five Percenter literature, DPS does not impose a blanket ban on publications related to NGE or Five Percenter subjects. (Id. ¶ 26; Brown Supp. Aff. ¶ 13). In fact, the record reflects that DPS officials permitted plaintiff to possess written correspondence between plaintiff and an NGE leader which related to plaintiff's questions regarding NGE beliefs.[2] (Pl.'s Resp. (DE 62) Ex. I). Additionally, DPS maintains a policy requiring an inmate to submit any desired publication related to Five Percenters to a review committee for review on a case-by-case basis. (Brown Supp. Aff. ¶ 13); DPS Policies and Procedures, Chpt. D, § .01023(d). Plaintiff has never submitted any Five Percenter publication for review. (Id.) That said, defendant Dunston attests that he has never reviewed any Five Percenter materials which do not promote hate or violence. (Dunston Supp. Aff. ¶¶ 22, 26).

---

[2] The record reflects that prison officials initially charged plaintiff with a disciplinary offense for possession of the NGE materials at issue. (Pl.'s Resp. (DE 62) Ex. I). However, after prison officials reviewed the materials, the charge was dismissed and plaintiff was permitted to keep the materials. (Id.)

Over the years, defendant Brown has received requests from NGE affiliated inmates, including one from plaintiff in 2013, to recognized NGE or Five Percenters as a religion within DPS.[3] (Brown Supp. Aff. ¶¶ 6, 10 and Ex. B; Brown Aff. Ex. C). In order to investigate the issue, defendant Brown asked Khalil A. Akbar, in 2012, to draft a memorandum regarding Five Percenters. (Brown Supp. Aff. and Ex.A). Defendant Brown chose Akbar to draft the memorandum regarding NGE based upon her belief that Akbar, as a member of Islam, had knowledge about groups such as NOI and NGE, which are off-shoots of Islam. (Id. ¶ 7). In his memorandum, Akbar recommended that DPS not recognize Five Percenters as a religious group based upon his determination, *inter alia*, that "at the core of [Fiver Percenter] teaching is the belief that the Black Man is god and the White Man is the devil." (Id. Ex. A) (internal quotations omitted). Akbar further determined that DPS has never recognized Five Percenters as a religion because "[t]hey sought recognition as a 'culture' which placed them outside of the purview of Religious Services and into the purview of Education." (Id.) Finally, Akbar noted that the Five Percenters had "attracted the attention of some young people who primarily are gang members" and that the group has been classified as a STG in correction systems across this nation. (Id.).

On October 2, 2014, defendant Brown met with DPS's Religious Practices Committee ("RPC"). (Id. ¶ 10 and Ex. B). As part of the meeting, the RPC discussed the instant pending lawsuit, as well as the pending lawsuit of another Five Percenter inmate. (Id.) Brown attests that the RPC considered plaintiff's request to practice NGE and determined that, based upon NGE's own materials, the group was not a religion. (Id.) The RPC, however, discussed the fact that plaintiff maintained the ability to practice Islam, his officially declared religious preference, in whatever

---

[3] The court notes that plaintiff's July 9, 2013, Inmate Request for Religious Assistance was rejected on July 15, 2013, on the grounds that it was submitted without following proper process. (Brown Aff. Ex. C, p. 5).

9

fashion his maximum control ("MCON") custody level permitted. (Id. ¶ 11 and Ex. B). As an MCON status inmate, plaintiff could not attend corporate services. (Id.); DPS Policies and Procedures, Chpt. H, § .0106(d). As a result, he was free to individually practice his religious beliefs -whether they be NGE or Five Percenters-within the privacy of his cell. (Id.)

## DISCUSSION

A.     Motion to Seal

Defendants seek to seal their exhibits D-F, which are attached to defendant Dunston's supplemental affidavit. Although plaintiff did not formally oppose the motion, he states in his supplemental declaration that he does not know how to the unseal the documents. (Pl.'s Supp. Decl. (DE 73) ¶ 19). The exhibits at issue contain UBN, NGE, and NOI materials which defendants argue would pose a security risk if disclosed to inmates.[4] The court has considered the motion under the governing standard, and determines that the exhibits should be sealed. See, e.g., Doe v. Pub. Citizen, 749 F.3d 246, 271–73 (4th Cir. 2014). In particular, the documents at issue have been deemed a threat to institutional security by DPS officials and are not permitted to be possessed by inmates. Thus, defendants' motion to seal is GRANTED. See Brown v. Ray, 695 F. Supp. 2d 292, 307-308 (W.D. Va. 2010) (granting motion to seal "Final Call" publication). The clerk of court is DIRECTED to maintain Exhibits D-F (DE 68), attached to defendant Dunston's supplemental affidavit, under seal.

---

[4] For this reason, defendants did not provide plaintiff with a copy of the exhibits. However, the UBN materials found in exhibit D were confiscated from plaintiff. (Dunston Supp. Aff. ¶ 13).

10

B.      Motion for Summary Judgment

1.      Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial.  Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  Anderson, 477 U.S. at 250.

2.      Analysis

Defendants raise the affirmative defense of qualified immunity with respect to their First, Eighth, and Fourteenth Amendment claims.  Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

As an initial matter, the court addresses defendants' argument that RLUIPA and the First Amendment do not apply in this action because NGE is not a religion.  The court assumes for the

11

purposes of the motion for summary judgment that NGE constitutes a religion. This is consistent with the approach taken by other courts which have addressed the issue. See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 468 (4th Cir. 1999); see also, Coward v. Jabe, No. 1:10CV147, 2014 WL 932514, at *4 (E.D. Va. Mar. 10, 2014) ("Because an answer is not necessary to the ultimate decision here, it is enough to join other courts in simply assuming that NGE constitutes a religion."), dismissed, 647 F. App'x 181 (4th Cir. 2016); see also, Marria v. Broaddus, No. 97Civ.8297NRB, 2003 WL 21782633, at *7 (S.D.N.Y July 31, 2003). The court now turns to plaintiff's RLUIPA and First Amendment claims.

      a.      RLUIPA and First Amendment

Beginning with plaintiff's RLUIPA claim, RLUIPA provides, in part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

> (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).

Under RLUIPA, the plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of his religion. See 42 U.S.C. § 2000cc-2(b). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009). A "'substantial burden' is one that puts substantial pressure on an adherent to modify his

12

behavior and to violate his beliefs, . . . or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted).

Once the inmate makes a prima facie showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." Ozmint, 578 F.3d at 250. "'RLUIPA adopts a . . . strict scrutiny' standard." Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (quoting and citing Lovelace, 472 F.3d at 198 n. 8). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quotation omitted); Ozmint, 578 F.3d at 252 (quotations omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . Rather, due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" Couch, 679 F.3d at 201 (quoting Lovelace, 472 F.3d at 190); see Holt v. Hobbs, 135 S. Ct. 853, 866 (2015).

As for the First Amendment, the Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. The United States Supreme Court has applied the First Amendment to the states through the Fourteenth Amendment. See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that

belief. <u>Hernandez v. Comm'r</u>, 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is rationally related to furtherance of a legitimate governmental or penal interest. <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 349 (1987); <u>Turner v. Safely</u>, 482 U.S. 78, 89–91 (1987).

In deciding whether a defendant's actions can be sustained as "reasonably related to legitimate penological interests," the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. <u>See</u> <u>Turner</u>, 482 U.S. at 89–90. Claims pursuant to the First Amendment and RLUIPA are evaluated under the same factors, but First Amendment claims are subject to a less demanding standard of proof. <u>See</u> <u>Lovelace</u>, 472 F.3d at 199, n.8 ("RLUIPA adopts a 'more searching standard' of review than that used for parallel First Amendment claims, strict scrutiny instead of reasonableness.") (quoting <u>Madison v. Ritter</u>, 355 F.3d 310, 314-15 n.1 (4th Cir. 2003)).

The court now considers plaintiff's RLUIPA and First Amendment claims relating to his requests for corporate worship, holiday fasting, written materials, and possession of a medallion or flag. <u>See</u> 42 U.S.C. § 2000cc-1(a); <u>Allah v. Virginia</u>, No. 2:12–cv–00033, 2014 WL 1669331, at *4 (W.D. Va. Apr. 28, 2014) ("RLUIPA concerns 'the religious exercise of a person,' and not a group or institution." (quoting 42 U.S.C.A. § 2000cc–1(a).)), <u>aff'd</u>, 601 F. App'x 201 (4th Cir. 2015). The court will address each of these requests in turn.

1.    Corporate Worship

The court assumes, without deciding, that plaintiff is able to establish a *prima facie* case with respect to his challenge to DPS's ban on corporate worship for NGE practitioners. Accordingly, the court must determine whether such policy furthers a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.

In an effort to meet their burden, defendants assert that DPS prevents plaintiff from participating in NGE corporate worship for the purposes of institutional security. The record reflects that NGE members have a history of violence against correctional staff and of criminal activities such as the exchange of contraband which threatens the safety and security of the facility. (Dunston Aff. ¶¶ 4, 8; Dunston Supp. Aff. ¶¶ 12, 18-20.) The record further reflects examples of gang-related violence inflicted by plaintiff, a validated Level III STG member of the UBN, and of other gang-related incidents carried out by other NGE or Five Percenter inmates. (Dunston Supp. Aff. ¶¶ 12, 18-20 and Ex. A, p. 3; Dunston Aff. Ex. A). Other courts, likewise, have acknowledged the link between NGE and prison violence. See e.g., In re Five Percenters, 174 F.3d at 467 (noting (1) that a federal intelligence summary "called the Five Percenters a 'radical Islamic sect/criminal group' that 'is often boldly racist in its views, prolific in its criminal activities, and operates behind a facade of cultural and religious rhetoric'" and (2) that a New Jersey intelligence report described "the Five Percenters as 'a group of individuals who espouse violence as a means to an end'"); see also, Self–Allah v. Annucci, No. 97-CV-607(H), 1999 WL 299310, at *9 (W.D.N.Y. March 25, 1999) (referring to the "substantial history of violence associated with Five Percenter activities"). Further, NGE has been designated a "security threat group" by a number of prison systems, including the Federal Bureau of Prisons, In re Five Percenters, 174 F.3d at 467; the South Carolina Department

15

of Corrections, id. at 465; the New Jersey Department of Corrections, Fraise v. Terhune, 283 F.3d 506, 517 (3d Cir. 2002); and the Virginia Department of Corrections, Cartwright v. Meade, No. 7:08-cv-00250, 2008 WL 2944668, at *1 (W.D. Va. July 31, 2008), aff'd, 302 F. App'x 132 (4th Cir. 2008). See Ciempa v. Jones, 477 F. App'x 508, 509 n. 1 (10th Cir. 2012) ("The NGE has been designated as a prison security threat group in Michigan, New Jersey, North Carolina, South Carolina, and Virginia.") (citation omitted).

In addition to the link to prison gang-related violence, defendants presented evidence that NGE has a documented history of racial supremacist beliefs. For instance, although plaintiff states that NGE is open to all races, plaintiff, himself, states in his amended complaint that a central tenet of NGE is the belief that "the white man is the devil made from a process of Eugenics known to both groups [NGE and NOI] as Grafting." (Am. Compl. ¶ 15). Moreover, the NGE materials attached to defendant Dunston's supplement affidavit contain references to the white man as the devil and advocate for the development of a separate black society. (Dunston Supp. Aff. Ex. E, pp. 4, 6, 8 and Ex. F.) NGE's history of racist teaching and rhetoric additionally has been well documented by other courts. See In re Five Percenters, 174 F.3d at 466-467 (stating "[a] federal intelligence summary . . . called the Five Percenters a "radical Islamic sect/criminal group" that "is often boldly racist in its views, prolific in its criminal activities, and operates behind a facade of cultural and religious rhetoric."); Ciempa, 477 F. App'x at 509 n.2 ("According to NGE literature, the white race is equated with the Devil.") (citation and internal quotation omitted); see also, Versatile v. Johnson, No. 3:09CV120, 2011 WL 5119259, at * 11 (E.D. Va. Oct. 27, 2011) (finding "Versatile's position that NGE teaches freedom, justice, and equality to all human families must be evaluated in the context of all NGE teachings. NGE also teaches that Caucasians are a mentally and physically

16

inferior race, are the devils, and must be taken off the planet."), aff'd, 474 F. App'x 385 (4th Cir. 2012); Tucker v. Livingston, No. 6:14cv659, 2015 WL 6560538, at * 8 (E.D. Tex. Oct. 28, 2015) ("NOGE has a documented history of racist teachings and rhetoric, along with criminal activities and violence.").

Finally, DPS prevents all inmates on restrictive housing status from engaging in corporate worship due to safety concerns. See DPS Policies and Procedures, Chpt. H, § .0106(d). Prison safety, security, and racial harmony, are compelling government interests. See Cutter, 544 U.S. at 722, 725 n. 13 ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests."); Lovelace, 472 F.3d at 190 (citation omitted). A prison is free to deny inmate religious requests predicated on RLUIPA if they "jeopardize the effective functioning of an institution." Cutter, 544 U.S. at 726. Congress, when enacting RLUIPA, was "mindful of the urgency of discipline, order, safety, and security in penal institutions." Id. at 723 (citation omitted). Congress "anticipated that courts would apply the [RLUIPA's] standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with considerations of costs and limited resources.") Id. (quotations and citation omitted). Thus, the court finds that the DPS policy preventing NGE members from engaging in corporate worship is in furtherance of a compelling governmental interest. See Allah, 2014 WL 1669331, at * 8-10 (finding in favor of the Virginia Department of Correction that its security interests outweigh the right of a Five Percenter to possess NGE material, wear special

clothing, or conduct meetings, and that the total ban was the least restrictive means of preventing Five Percenters from jeopardizing institutional safety).

The court next determines whether the DPS policy banning corporate worship for NGE members is the least restrictive means of furthering the interests of security. Defendant Dunston attests in his affidavit that NGE poses a "risk to the prisons, staff, and public in North Carolina" and that any lesser restrictions would "compromise the security of our institutions, staff, and the public." (Dunston Supp. Aff. ¶ 25). In accordance with the well-documented relationship of NGE with violent gang activities, the examples of gang-related violence among Five Percenter inmates (including plaintiff), and the Five Percenter racial rhetoric, the court finds that the DPS polies at issue are the least restrictive means of furthering a compelling governmental interest, and plaintiff failed to establish a RLUIPA violation. See, Allah, 2014 WL 1669331, at * 8-10.

Because RLUIPA requires a more stringent strict scrutiny standard than the First Amendment, the court further finds that the policy at issue is reasonably related to legitimate penological interests. See Lovelace, 472 F.3d at 199–200 ("[T]he First Amendment affords less protection to inmate's free exercise rights than does RLUIPA."). Thus, plaintiff failed to establish a RLUIPA or First Amendment violation.

### 2. Fasting Schedule

Plaintiff requests a court order directing DPS to arrange his meal schedule so that he may fast on four NGE holy days. The court first conducts the substantial burden analysis. In conducting a "substantial burden" analysis, a court should not judge the significance of a particular belief or practice to the religion at issue. Cutter, 544 U.S. at 725 n. 13; Lovelace, 472 F.3d at 187 n. 2. Rather, RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a

system of religious belief." 42 U.S.C. § 2000cc–5(7)(A) (emphasis added). Thus, a plaintiff must demonstrate that a governmental entity substantially pressured him to modify his behavior and to violate his religious beliefs in order to demonstrate that his religious practice has been substantially burdened. See Lovelace, 472 F.3d at 187. A plaintiff, however, is not required, as part of this prima facie showing, to prove that the exercise at issue is required by or essential to his religion. See Cutter, 544 U.S. at 725 n. 13.

The court focuses its inquiry on whether plaintiff has presented evidence to demonstrate that DPS's alleged refusal to accommodate his religious fasting substantially pressured him to modify his behavior and violate his religious beliefs. According to plaintiff's own allegations, NOI and NGE are similar in nature, and at least two of the holy days at issue also are observed by NOI members. (Am. Compl. ¶¶ 15, 19). Plaintiff has designated a religious preference of Islam, and is permitted to observe the Islamic holiday fasting schedule. (Brown Aff. ¶ 16 ). Plaintiff has not shown how observance of the Islamic holiday fasting schedule would pressure him to modify his behavior and to violate his religious beliefs. Rather, plaintiff simply relies upon his unreasoned say-so, which is insufficient to meet his burden of establishing that DPS's alleged failure to accommodate his holiday fasting schedule resulted in a substantial burden to his practice of NGE. See Krieger v. Brown, 496 F. App'x 322, 326 (4th Cir. 2012) ("Because Krieger did not show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs, the district court correctly determined that Krieger failed to establish a prima facie case under RLUIPA."); Gelford v. Frank, 310 Fed. Appx. 887, 889 (7th Cir. 2008) (finding that Wiccan inmates failed to demonstrate that prison's failure to provide them with requested divination tools, including a pendulum, substantially burdened their religious practice);

DeSimone v. Bartow, 355 F. App'x 44, 46 (7th Cir. 2009) ("noting the insufficiency of a plaintiff's 'unreasoned say-so' to create a triable issue") (quoting Borzych v. Frank, 439 F.3d 388, 390 (7th Cir. 2006)); see also, Marron v. Jabe, No. 1:12cv468(TSE/TRJ), 2014 WL 585850, at *5 n. 5 (E.D. Va. Feb. 14, 2014) (citations omitted) ("[P]laintiff asserts that without the ability to order CD's from a lawful source, he cannot learn or practice [his] religion at all and if [he] doesn't learn [his] religion [he] will be a disbeliever and [he] fear[s] nothing not even death itself except the wrath of Allah[.] Such generalized and non-specific explanations do not coherently or sufficiently articulate the existence of a substantial burden on plaintiffs religious practice." (internal quotation omitted)), aff'd, 582 F. App'x 210 (4th Cir. 2014); Gordon v. Mullins, No. 7:12cv00494, 2014 WL 1118199, at *6 (W.D. Va. Mar. 20, 2014) ("Although denying Gordon the ability to choose which books he kept may have made it more difficult, inconvenient, or expensive for him to understand and practice his faith, that does not rise to the level of a substantial burden."), aff'd, 582 F. App'x 248 (4th Cir. 2014).

Based upon the foregoing, plaintiff failed to establish the DPS policy at issue substantially burdened his practice of NGE. Accordingly, plaintiff is unable to establish a RLUIPA or First Amendment violation.

### 3.    Religious Texts and Other Written Materials

Plaintiff contends that DPS's policies prevent him from obtaining copies of NGE primary texts, secondary texts, or any other NGE or Five Percenter publication. In response, defendants argue that DPS does not place an absolute ban on all NGE or Five Percenter publications. Rather, an inmate may submit any publication requests to a publication review committee for a case-by-case review. (Brown Supp. Aff. ¶ 13 and Dunston Supp. Aff. ¶ 26); DPS Policies and Procedures, Chpt.

20

D, § .01023(d).  Plaintiff has not submitted any requests for NGE or Five Percenter materials to the publication review committee.  (Id.)  Accordingly, plaintiff has not shown how DPS's publication policies pressured him to modify his behavior and to violate his religious beliefs.

In any event, DPS's policy of banning materials that contain violent or racist sentiments is connected to the compelling interest of prison safety.  See, e.g., Allah, 2014 WL 1669331, at *7 (W.D. Va. Apr. 28, 2014) (finding ban on NGE materials which espouse violent or racist sentiment is connected to the compelling state interest of prison safety); Johnson v. Stewart, No. 08-1521, 2010 WL 8738105, at *2 (6th Cir. May 5, 2010) ("The district court properly applied the Turner test and determined that the designation of the Nation of Gods and Earths as an STG and the corresponding ban on the Five Percenter newspaper are constitutionally permissible."); Johnson v. Jabe, No. 7:09CV00300, 2011 WL 2493763, at *3 (W.D. Va. June 22, 2011) ("[T]he VDOC had reasonably determined that NGE constituted a gang, the VDOC had a compelling interest in restricting gang activities, and the institutional ban on NGE materials was the least restrictive means of furthering this interest.") (citation omitted), aff'd, 456 F. App'x 318 (4th Cir. 2011).

As for the least restrictive means analysis, DPS does not impose a complete ban on NGE materials.  (Daniels Supp. Aff. ¶ 26; Brown Supp. Aff. ¶ 13); DPS Policies and Procedures, Chpt. D, § .01023(d).  In fact, the record reflects that prison officials have allowed plaintiff to possess NGE materials, namely written correspondence with an NGE leader.  (See (DE 62) Ex. I).  In light of the fact that DPS does not impose a complete ban on NGE materials and the established connection between NGE and gang activity and racial supremacist beliefs, DPS's policy regarding NGE publications is the least restrictive means of serving a compelling government interest.  Based

upon the foregoing, plaintiff is unable to establish a RLUIPA or First Amendment violation with respect to this claim.

### 4. Vegan Diet

Plaintiff seeks a vegan diet, and the court first determines whether plaintiff's inability to obtain a vegan diet substantially burdens his practice of NGE. According to plaintiff, NGE members adhere to the same dietary restrictions as NOI members, which consists of "refraining from consuming or using pork or its by-products." (Compl. ¶ 18). Plaintiff states that he has been forced to choose between either eating meat or foregoing the meat provided in his regular diet in order to comply with his NGE beliefs. (Am. Compl. ¶ 53 and Attach. Ex. B-1). The record, however, reflects that plaintiff has the option of choosing a lacto-ovo vegetarian diet, which is the same diet available to Islamic inmates. (Brown Supp. Aff. ¶ 12). Plaintiff does not dispute this fact. Nor has plaintiff submitted any evidence to establish that consuming the lacto-ovo vegetarian diet would substantially burden his practice of NGE.

To the extent plaintiff contends that some farmers give their animals "pork feed" or preservatives that contain "pork derivatives," such speculative allegations alone do not establish that the lacto-ovo diet constitutes a significant burden on his religious beliefs. See Abdulhaseeb v. Calbone, 600 F.3d 1301, 1321 (10th Cir. 2010) ("We accept Mr. Abdulhaseeb's contentions that the Jell-O and pudding were questionable at best, and thus placing them on his tray rendered all the food on the tray contaminated and inedible for him. We are not willing to conclude, however, that every single presentation of a meal an inmate considers impermissible constitutes a substantial burden on an inmate's religious exercise."), cert. denied, 131 S. Ct. 469 (2010); Muhammad v. Sapp, 388 F. App'x 892, 897 (11th Cir. 2010) (finding no RLUIPA violation where prison rejected Orthodox

Sunni Muslim inmate's demands "for an alcohol-free lacto-vegetarian diet 'prepared with and served on non-disposable utensils' that had never come into contact with meat or alcohol products or byproducts" and that were "not . . . prepared near meals containing meat or alcohol because of the contamination risk"); see also, Holsombach v. Norris, No. 2:08CV00022, 2009 WL 424166, at *6 (E.D. Ark. Feb. 18, 2009) ("[I]t appears that Defendants employ reasonable measures to maintain a division between the main-line food preparation and Kosher food preparation . . . . Defendants cannot be held, however, to an absolute standard. They must take reasonable measures, but are not liable for random incidents of misconduct by inmates."); Frazier v. Ferguson, Civil Action No. 04-5140, 2006 WL 2052421, at *4 (W.D. Ark. July 21, 2006) (finding no substantial burden under RLUIPA where Seventh-day Adventist inmate received vegetarian diet and had to discard some items that did not comport with his religious preference for vegan diet). Based upon the foregoing, plaintiff has not established that his alleged inability to obtain a vegan diet substantially burdened his practice of NGE. Accordingly, plaintiff is unable to establish a RLUIPA or First Amendment violation with respect to this claim.

### 5.     Possession of Medallion or Flag

Plaintiff contends that DPS's refusal to permit him to possess a NGE medallion or flag substantially burdens his practice of NGE. Beginning with the substantial burden analysis, plaintiff has failed to provide facts or evidence, aside from his unreasoned say-so, to establish that his inability to possess a NGE medallion or flag pressured him to modify his behavior and violate his religious beliefs. Thus, plaintiff failed to establish a *prima facie* case with respect to this claim. See Krieger, 496 F. App'x at 326. Furthermore, DPS's policy of banning NGE medallions or flags which may invoke violent or racist sentiments is connected to the compelling interest of prison

safety.  See, e.g., Allah, 2014 WL 1669331, at *10.  DPS's ban on such materials employs the least restrictive means possible to further a compelling interest in prison security, particularly in light of the evidence linking NGE with gang activity.  See id. Based upon the foregoing, plaintiff is unable to establish a RLUIPA or First Amendment violation.

Given the fact that there is no underlying constitutional violation, plaintiff's supervisor liability claims lack merit.  See Hinkle v. City of Clarksburg, W. Va., 81 F.3d 416, 420 (4th Cir. 1996) (holding that absent an underlying constitutional violation, no § 1983 liability attaches to a supervisor); Thomas v. Holly, 533 F. App'x 208, 221 (4th Cir. 2013) (noting that a finding of bystander liability for a defendant required a finding of excessive force by another defendant). Additionally, because the court has determined that there is no First Amendment violation, defendants are entitled to qualified immunity for such claims.

      b.     Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. To that end, the Equal Protection Clause provides that "all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  To establish an Equal Protection claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.  If he makes this showing, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Veney v. Wyche, 293 F.3d 726, 730–31 (4th Cir. 2002) (internal quotation omitted); Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).  In a prison context, this level of scrutiny is "whether

the disparate treatment is reasonably related to [any] legitimate penological interests." Veney, 293 F.3d at 732 (internal quotation omitted).

In support of his equal protection claim, plaintiff presents the affidavits of three STG validated inmates on intensive control custody status. (Pl.'s Resp. (DE 62), Exs. P, P-1, Q.) The inmates identified by plaintiff include members of the Jewish, Rastafarian, and Moorish Science Temple faiths. (Id.) The inmates state that they are able to possess religious publications, religious items, and follow religious diets.[5] (Id.) The record, however, reflects that DPS's scrutiny of NGE publications and materials is based upon the documented connection between NGE publications with gang violence and racial supremacist rhetoric. See In re Five Percenters, 174 F.3d at 467; (Dunston Aff. Ex. B; Dunston Supp. Aff. ¶¶ 7, 19, 20). There is no evidence that the alleged differing treatment among religious groups is the result of purposeful discrimination. Thus, plaintiff failed to establish a *prima facie* equal protection claim.

Even if plaintiff could establish a *prima facie* equal protection claim, he still cannot establish a constitutional violation. An inmate's equal protection claim fails if defendants establish that the disparate treatment was reasonably related to any legitimate penological interests. Veney, 293 F.3d at 732 (internal quotation omitted). As stated, plaintiff has not established that the Islamic diet he is permitted to follow substantially burdens his practice of Islam. Nor has plaintiff provided evidence that DPS has acted with any discriminatory intent with respect to his dietary needs. Further, the policies restricting NGE publications and religious items serve the legitimate

_____

[5] The court notes that inmate Donald Mitchell states that he was permitted to engage in corporate worship when he was in regular population. (Pl.'s Resp. (DE 62), Ex. P, p. 2). However, plaintiff is on MCON status, and not in regular population. (Brown Supp. Aff. ¶ 11). No inmate on restricted housing status is permitted to engage in corporate worship. See DPS Policies and Procedures, Chpt. H, § .0106(d). Accordingly, plaintiff and Mitchell are not similarly situated with respect to Mitchell's ability to engage in corporate worship while in regular population.

penological interest of prison safety. See In re Five Percenters, 174 F.3d at 466 (finding that the designation of the Five Percenters as a security threat group is "a rational response to a threat to prison safety-a concern peculiarly with the province of penal authorities."). The Fourth Circuit has recognized that "prison safety and security are legitimate penological interests." Veney, 293 F.3d at 732; Morrison, 239 F.3d at 655 ("[W]hile a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoner claims under the equal protection clause, including those based upon a racial classification, must still be analyzed in light of the special security and management concerns in the prison system.") (citations omitted). Based upon the foregoing, plaintiff fails to establish a Fourteenth Amendment violation, and defendants are entitled to qualified immunity for this claim.[6]

### c. Eighth Amendment

Plaintiff alleges that prison officials' refusal to accommodate his request for a vegan diet violated his rights pursuant to the Eighth Amendment. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.'" Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991)). The first prong is an objective one-the prisoner must show that "the deprivation of [a] basic human need was *objectively* sufficiently serious"–and the

---

[6] Plaintiff states that NOI members are permitted to study the NOI text, but that plaintiff is not. (Pl's Supp. Resp. p. 6; Am. Compl. ¶ 33). Plaintiff, however, failed to present any evidence to support this allegation, and, thus, is unable to establish an equal protection claim. See Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009) (citation omitted); see, e.g., White v. White, 886 F.2d 721, 723 (4th Cir.1989) (stating minimum level of factual support required). Plaintiff, additionally, has not presented any evidence that he requested the text and his request was denied.

second prong is subjective–the prisoner must show that "*subjectively* the officials act[ed] with a sufficiently culpable state of mind." See Strickler, 989 F.2d at 1379 (internal quotations omitted).

Assuming, without deciding that plaintiff is able to establish the objective prong of the Eighth Amendment test, the court focuses on the subjective prong–whether defendants acted with deliberate indifference to plaintiff's serious medical needs. Deliberate indifference "sets a particularly high bar to recovery." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). As stated, "deliberate indifference entails something more than negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." See Farmer v. Brennan, 511 U.S. 825, 835 (1994). It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995).

Plaintiff contends that, in his efforts to comply with his NGE faith requiring abstention from consuming pork or pork by-products, he has been forced to refrain from eating the meat served on his regular diet plan, which has caused him to experience fatigue and cramps. As discussed above, plaintiff has the opportunity to request a lacto-ovo vegetarian diet, which complies with his NGE dietary restrictions. (Brown Supp. Aff. ¶ 12). To the extent plaintiff prefers to receive a vegan as opposed to a lacto-ovo diet, such a preference does not implicate the constitution. See Harrison v. Moketa, Motycka, 485 F. Supp. 2d 652, 656 (D.S.C. 2007) (citation omitted), aff'd 235 F. App'x 127 (4th Cir. 2007); see also, Kemp v. Drago, No. C/A No. 1:12–1481–JFA–SVH, 2013 WL 4874972, at *9 (D.S.C. Sept. 11, 2013) ("The Constitution does not guarantee [ ] food that is prepared and served in a culinarily-pleading manner."), aff'd, 558 F. App'x 328 (4th Cir. 2014). Finally, plaintiff has not presented any evidence that defendants' intended to cause him harm.

See Estelle v. Gamble, 429 U.S. 97, 105-106 (1976); Farmer, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he [or she] should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). Finally, as for plaintiff's contention that DPS's refusal to accommodate his four days of fasting pursuant to his NGE faith, plaintiff again failed to establish that defendants acted with any intent to cause harm or to provide evidence that any harm resulted. See Estelle, 429 U.S. at 105-106; Danser v. Stansberry, 772 F.3d 340, 346–47 (4th Cir. 2014) (stating a prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury or substantial risk to either injury" to establish an Eighth Amendment claim) (internal quotation omitted).

Based upon the foregoing, plaintiff failed to satisfy the subjective prong of the Eighth Amendment test, and has failed to establish a constitutional violation. Thus, defendants are entitled to qualified immunity for this claim.

## CONCLUSION

For the foregoing reasons, the court orders as follows:

(1)      Defendants' motion to seal (DE 69) is GRANTED and the clerk of court is DIRECTED to maintain Exhibits D-F (DE 68), attached to defendant Dunston's supplemental affidavit, under seal;

(2)      Defendant's motion for summary judgment (DE 57) is GRANTED;

(3)     The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 23rd day of September, 2016.

_____
LOUISE W. FLANAGAN
United States District Judge

29