IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CT-3193-FL

| ANTOINE MONTEZ MILES, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | |
| | ) | ORDER |
| DAVID GUICE, GEORGE SOLOMON, LARRY DUNSTON, KIERAN SHANAHAN, BETTY BROWN, and FRANK PERRY, | ) | |
| Defendants.[1] | ) | |

This matter is before the court on plaintiff's motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) (DE 127) and to strike affidavit of Christopher Rich (DE 145). The matter also is before the court on defendants' motions to seal (DE 133, 141). The issues raised have been fully briefed and in this posture are ripe for decision. For the reasons that follow, the court denies the motion for summary judgment, grants in part and denies in part the motion to strike, and grants the motions to seal.

**STATEMENT OF THE CASE**

The procedural background of this action is set forth in the court's January 22, 2018, order, and is restated in relevant parts here. On August 14, 2013, plaintiff filed a § 1983 action alleging violations of the First Amendment and Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., pertaining to his beliefs under the Nation of Gods and

---

[1] The court constructively has amended the caption of this order to reflect dismissal of formerly-named defendant Gwen Norveil on April 10, 2014.

Earths ("NGE").[2] On November 27, 2013, plaintiff filed a verified amended complaint adding claims alleging violations of the Eighth Amendment and Fourteenth Amendment Due Process and Equal Protection Clauses. Plaintiff's amended complaint alleged defendants David Guice ("Guice"), George Solomon ("Solomon"), Larry Dunston ("Dunston"), Kieran Shanahan ("Shanahan"), Betty Brown ("Brown"), and Frank Perry ("Perry), denied his requests for religious accommodation for NGE corporate worship, fasting, possessing religious texts, a vegan diet, and possession of a medallion or flag. Plaintiff seeks monetary and injunctive relief.

On February 26, 2015, the court dismissed plaintiff's due process claim but allowed the remaining claims to proceed. On September 23, 2016, the court granted summary judgment in favor of defendants, concluding that the undisputed evidence did not establish a violation of RLUIPA or plaintiff's constitutional rights.

Plaintiff appealed the court's judgment, and on April 21, 2017, the United States Court of Appeals for the Fourth Circuit affirmed in part, vacated in part, and remanded the judgment. The Fourth Circuit affirmed the court's analysis of the underlying claims, except for the treatment of plaintiff's fasting claim. See Miles v. Guice, 688 F. App'x 177, 179 (4th Cir. 2017) (per curiam). For the fasting claim, the court vacated and remanded, concluding failure to accommodate fasting on holy days does present a substantial burden under RLUIPA and should be analyzed under a strict scrutiny standard. Id.

On May 24, 2017, the court requested further briefing from the parties on whether defendants' asserted failure to accommodate plaintiff's fasting request violated RLUIPA under a

---

[2] Both plaintiff and defendants recognize the relative interchangeability of the terms "Nation of Gods and Earths" and "Five Percenters." (See Am. Compl. (DE 8) ¶ 12; Dunston Aff. (DE 58) ¶ 7; Brown Aff. (DE 59) ¶ 10). The court will use the abbreviated term "NGE" when possible in accordance with plaintiff's definition when referring to the belief system as a whole. (See Am. Compl. (DE 8) ¶ 12).

strict scrutiny standard. On August 9, 2017, defendants filed a second motion for summary judgment, arguing they satisfied RLUIPA's strict scrutiny standard. The motion was fully briefed.

On January 22, 2018, the court denied defendants' second motion for summary judgment, concluding that defendants had not demonstrated that the North Carolina Department of Public Safety's ("DPS") refusal to accommodate plaintiff's fasting requests is the least restrictive means of further a compelling governmental interest. In that same order, the court referred the matter to a magistrate judge for a court-hosted settlement conference and appointed North Carolina Prisoner Legal Services, Inc. ("NCPLS") to represent plaintiff at the settlement conference.

The parties were unable to reach settlement at the conference. On March 13 and 14, 2018, NCPLS attorneys entered general notice of appearance on behalf of plaintiff. On April 3, 2018, the court entered case management order, which reopened discovery and established deadlines for completing supplemental discovery and filing pretrial motions. On October 30, 2018, plaintiff filed consent motion for leave to file motion for summary judgment, which the court granted.

On November 30, 2018, plaintiff filed the instant motion for summary judgment, relying upon a memorandum of law, a statement of material facts, and the following exhibits: 1) expert report of Martin Horn ("Horn"); 2) first supplemental expert report of Horn; 3) second supplemental expert report of Horn; 4) plaintiff's three declarations; 5) Form DC-572 inmate request for religious assistance and supporting documents; 6) DPS Religious Practices Reference Manual; 7) DPS Religious Services Policies and Procedures; 8) defendant Brown's DC-572 Response; 9) Plaintiff's correspondence with DPS and responses; 10) defendants' responses to plaintiff's first set of discovery requests; 11) Security Threat Group Manual; 12) 1996 Five Percenter Security Threat Group Validation Worksheet; 13) 1997-1998 Prison Incidents; 14) 2015-2018 Prison Incidents; 15)

3

DPS conditions of confinement policies and procedures; and 16) DPS special management meals policies and procedures.

Defendants responded in opposition to the instant motion for summary judgment on January 22, 2019, relying upon a memorandum of law, statement of material facts, and the following exhibits: 1) affidavit of defendants' counsel and attached exhibits documenting plaintiff's criminal and disciplinary history; and 2) affidavit of Christopher Rich ("Rich"), DPS intelligence manager/criminal analyst, and accompanying exhibits. Defendants' opposition also relies upon exhibits filed in support of plaintiff's instant motion for summary judgment, and affidavits of defendants Brown and Dunston filed in support of defendants prior motions for summary judgment.

On February 4, 2019, plaintiff filed reply in further support of the instant motion for summary judgment, and the instant motion to strike the affidavit of Rich. In support of the motion to strike, plaintiff relies upon a memorandum of law and the following: 1) plaintiff's expert designation of Horn; 2) expert report of Horn; 3) defendants' initial disclosures; and 4) defendants' supplemental disclosures. The motion to strike was fully briefed.

## STATEMENT OF THE FACTS

As plaintiff moves for summary judgment, the court recounts the facts in the light most favorable to defendants.

A.  Plaintiff's NGE Beliefs

Plaintiff, a state prisoner, challenges defendants' refusal to accommodate his fasting schedule on NGE holy days. Plaintiff alleges NGE is a legitimate religion, founded in New York nearly fifty years ago. (See Am. Compl. (DE 8) ¶ 12; Pl.'s Decl. (DE 73-1) ¶ 4). Plaintiff has been an adherent of NGE since 2004. (Pl.'s Decl. (DE 130-4) ¶ 3).

4

The court has previously summarized plaintiff's NGE beliefs and associated fasting practices as follows:

> [T]he NGE is a group that does not have "an organizational structure or hierarchy[,]" and that is similar to the [Nation of Islam ("NOI")] religion. ([Am. Compl. (DE 8)] ¶¶ 12-18, 23.) Because DPS does not recognize NGE as a religion, plaintiff may not designate NGE as his religious faith preference. (Brown Aff. [DE 59] ¶ 10). Plaintiff, instead, has designated his religious faith preference as Islam. (Id. Ex. B). As a result, plaintiff may, within the parameters [of] his custody classification level, possess Islamic literature, request dietary accommodations consistent with the Islamic faith, participate in Islamic feasts, or participate in Islamic religious corporate worship. (Id. ¶¶ 15-16). Plaintiff also maintains the freedom to practice the Islamic faith, while following the teachings, directives, or preferences of NGE. (Id. ¶ 18).
>
> Plaintiff admits that NGE and NOI contain many similarities. For instance, both groups believe that "the white man is the devil made from a process of Eugenics known to both groups as Grafting." (Am. Compl. [DE 8] ¶ 15). NGE and NOI, however, are distinguishable on the ground that NGE permits white inmates to practice its beliefs, while NOI does not. (Id. ¶ 24). Plaintiff states that the NGE is not "anti-white or pro black but anti-devilishment and pro-righteousness." (Id. ¶ 24). NGE and NOI also use the same central texts including "120 Degrees," "Supreme Mathematics," and "Supreme Alphabet." (Id. ¶ 16.) NGE members, however, also study secondary texts including literature published by the "Allah School in Mecca," the "Allah Youth Center in Mecca," "The Sun of Man Publications," "Supreme Design Publishing," and "A-Team Publishing." (Id. ¶ 20.) NGE members must study the primary and secondary texts in conjunction "to get a deeper meaning in the teachings." (Id.) In addition to similar publications studied by NGE and NOI, both groups observe the practice of fasting in observance of the holy days. (Id. ¶ 19).

(September 23, 2016, order (DE 74) at 4-5).[3] NGE members observe the following holy days: 1) the birth and death of [NGE] founder, Clarence 13x; 2) the birthday of NOI founder W.D. Ford; and 3) the birthday of Elijah Muhammad. (Pl's Decl. (DE 130-4) ¶ 13). "Five Percenters in accords to the NGE belief system in observance of Holy days fast from sunrise till sunset as well as come

---

[3] Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

5

together and break the fast with a celebratory feast in commemoration of the Holy Ones['] accomplishments." (Am. Compl. (DE 8) ¶ 19).

B.  DPS Policies Concerning NGE

DPS classifies NGE as a security threat group ("STG"), based on past instances in which NGE adherents assaulted other inmates and corrections staff, and participated in other criminal activity within corrections institutions. (Dunston Aff. (DE 58) ¶ 7). Furthermore, NGE literature recovered from adherents in DPS custody includes racist and inflammatory views. (Id. ¶ 9; Rich Aff. (DE 139-4) ¶¶ 8-17). For example, an NGE document titled "lost-Found Muslim Lesson" contains the following statements:

1)  Black males are "the father of all civilization" and "owner of all the earth," while Caucasians are "the devil" (Rich Aff. (DE 139-4) ¶¶ 8, 11; Rich Aff., Ex. F (DE 140-4) at 2-5, 7-14);

2)  "[A]ny Muslim will murder the devil because he is a snake and if he is allowed to live he would only sting someone else" (Rich Aff., Ex. F (DE 140-4) at 6);

3)  Caucasians are "weak and wicked," and cause black people to "fight and kill one another" (Id. at 2);

4)  "[T]here would not be any peace" between NGE adherents and Caucasians (Id. at 2);

5)  Caucasians keep black men illiterate and enslave them (Id. at 3);

6)  Caucasians have smaller brains than black men, are less than a third as strong, and are weak boned and weak blooded (Id. at 12-13);

7)  God made Caucasians to allow them to rule the earth for 6,000 years, and then destroy them in one day, to prove that Allah is God (Id. at 14); and

> 8) Caucasians cannot be reformed and therefore God will "take [them] off [NGE adherents'] planet" (Id. at 13).

DPS officials have also recovered a document titled "The Manifestations of the Supreme Alphabets" from NGE adherents which redefines terms traditionally used by Islam. (Rich Aff. Ex. E (DE 140-3)). The document defines "A-Allah God" as "the rightful given name of the Asiatic Blackman, being God" and the "Ruler" as the "law maker." (Id. at 2).

DPS has also determined that NGE is closely associated with the United Blood Nation ("UBN"), a violent gang, and that members of the UBN use their NGE association as a guise to support gang-related activity. (See Dunston Aff. (DE 58) ¶¶ 7-9, 16-17). DPS, additionally, has identified incidents of violence from other inmates identifying as members of both the UBN and the Five Percenters. (Dunston Supp. Aff. (DE 67) ¶¶ 7, 19, 20). Specifically, on July 31, 2013, UBN and Five Percenter-affiliated inmate Dye assaulted another inmate, from a rival UBN group, with a blade leaving a 14.5 centimeter laceration to the inmate's face. (Id. ¶ 19). DPS officials subsequently determined that the assault was ordered and sanctioned by members of the UBN. (Id.). Then, on February 5, 2015, at Tabor Correctional Institution ("Tabor"), a Five Percenter inmate named Rogers attempted to assault a correctional officer after refusing the officer's orders. (Id. ¶ 20). As Rogers was being escorted out of the Tabor unit after the assault, he attempted to head-butt the escorting officer, and called the officers a "black devil" and a "white devil." (Id.).

DPS has validated plaintiff as a member of both the UBN gang and the Five Percenters (which as noted DPS considers a security threat group), and designated him an STG Level III, the highest STG classification reserved for the most dangerous gang members. (Dunston Aff. (DE 58) ¶¶ 11, 16). During plaintiff's second validation process, plaintiff admitted to being a "triple O"

7

member of the UBN, and was found in possession of 17 pages of UBN materials which contained his handwriting. (Dunston Suppl. Aff. (DE 67) ¶ 13 & Exs. C, D, E, F (DE 67-1, -2, -3, -4)).

Based on the above incidents and NGE literature espousing racists views, defendants have rejected plaintiff's requests to fast on NGE holy days and for recognition of NGE as a religion. (DPS Grievance Resp. (DE 1-1); Brown Suppl. Aff. (DE 70) ¶¶ 9-14).

C.    Horn Report

In his expert report, Horn noted that NGE is a belief system that broke away from NOI in 1964. (Horn Report (DE 130-1) at 9). However, "many of the theological accoutrements of Black Muslim belief remain [in NGE belief]: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." (Id. at 9-10). Horn summarized NGE's belief system as follows:

> NGE's beliefs are centered on a foundation text called the Book of Life, and it also draws from the Holy Qur'an. It speaks to the ultimate questions of human existence and life and occupies a place in the hearts, minds, and lives of its adherents akin to that filled by the orthodox belief in God in more mainstream religions. [Plaintiff] asserts that his God-centered culture/religion is as "theologically legitimate" for him as Christianity, Judaism, Catholicism, or any other religion.

(Id. at 6-7).

Horn also opined that inmates "of all different religions" participate in assaults, and therefore the fact that a member of a particular religion assaulted another inmate does not mean the religion itself should not be recognized by the prison system. (See id. at 12). Furthermore, Horn noted that some NGE texts expressly disclaim violence: "An NGE tract titled 'We Are Not A Gang' [provides that] '[y]ou cannot be in a gang and be in [NGE]' [and] NGE does 'not advocate hate, violence or disruptive behavior' – it 'encourages all members and people in general to be upright and law abiding.'" (Id.).

8

Horn noted that correctional departments in 14 states – Alabama, Connecticut, Illinois, Iowa, Maryland, Massachusetts, Michigan, Montana, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, and Rhode Island – recognize NGE as a religion and allow members to practice the religion in their facilities. (Id. at 13). A survey of correctional institutions that permit NGE practices indicates that the institutions have not experienced an increase in violent incidents after recognizing NGE as a religion. (Id. at 15). Horn also noted that DPS can supervise NGE congregational worship practices to ensure they do not promote racism or violence. (Id. at 16). Horn therefore opined that DPS has not established that a complete ban on NGE practices is the least restrictive means of serving a compelling governmental interest. (Id. at 19).

## DISCUSSION

A.      Motion to Strike

Plaintiff moves to strike the Rich affidavit submitted in support of plaintiff's motion for summary judgment. Plaintiff argues defendants first disclosed Rich as a potential witness in this action on November 30, 2018, over a month after the deadline set in the scheduling order for supplementation under Federal Rule of Civil Procedure 26(e). Plaintiff also argues the Rich affidavit is improper opinion testimony.

Rule 26(a)(1)(A), in relevant part, instructs that "a party must . . . provide to the other parties: (I) the name and, if known, the address and telephone number of each individual likely to have discoverable information." Further, Rule 26(e)(1) provides that

> [a] party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect ... or (B) as ordered by the court.

9

If a supplemental disclosure is not made in accordance with Rule 26(e), the remedy is to exclude the improper disclosure from trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "District courts are accorded broad discretion in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless." Bresler v. Wilmington Tr. Co., 855 F.3d 178, 190 (4th Cir. 2017). In exercising this discretion, "a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003).

Defendants' failure to supplement its Rule 26(a) disclosure by identifying Rich as a potential witness is harmless under these circumstances. As defendants explain, Rich was identified in defendants' timely interrogatory responses as the person who currently supervises DPS's procedures for identifying a group as a STG. (DE 148-1 at 6). Morever, Rich provided verified answers to plaintiff's interrogatories, and plaintiff had ample time in discovery to depose him after defendants produced the interrogatory responses. (Id. at 6-7, 18; Scheduling Order (DE 122)). The Rich affidavit also provides a summary of NGE documents that defendants timely disclosed in discovery. (Rich Aff. (DE 139-4), NGE Validation File DE (131-2)). Plaintiff cannot credibly argue that the failure to disclose Rich as a potential witness prejudiced them in these circumstances.

Plaintiff also argues the Rich affidavit should be excluded because it contains improper opinion testimony, and Rich was not disclosed as an expert witness pursuant to Rule 26(a)(2). Defendants agree they did not disclose Rich as an expert, but argue the testimony is proper lay

10

witness testimony. Defendants concede however, that the last three sentences of paragraph 17 of the affidavit should be stricken as improper expert opinion testimony.

Federal Rule of Evidence 701 provides that,

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> > (a) rationally based on the witness's perception;
> >
> > (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> >
> > (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"Because Rule 701 does not distinguish between expert and lay witnesses, but rather between expert and lay testimony, the line between lay opinion testimony under Rule 701 and expert testimony under Rule 702 is a fine one." United States v. Perkins, 470 F.3d 150, 155 (4th Cir. 2006) (quotations and citations omitted). Lay opinion testimony, however, "must be based on personal knowledge." Id. at 155–56.

Here, the Rich affidavit is based on his "personal knowledge" as a DPS intelligence manager/criminal analyst. (Rich Aff. (DE 139-4) ¶ 3). As part of his routine employment duties, Rich "monitor[s] and investigate[s] matters relating to [STGs]" within DPS prisons. (Id.). He therefore has personal knowledge of DPS's designation of NGE as a STG, which is a central issue in this action. (See id. ¶¶ 3-17). Rich also attached the full DPS "validation file" explaining DPS's decision to classify NGE as a STG, and plaintiff does not appear to contest the admissibility of the underlying documents Rich relies on in the affidavit. (Id. ¶ 4; Pl's Mem. (DE 146) at 6).

The substance of the affidavit also does not reflect expert opinion testimony. Rich attests that DPS considers NGE a violent and racist group and explains why DPS came to that conclusion

11

by summarizing relevant documents from the NGE validation file.  (See Rich Aff. (DE 139-4) ¶ 3-17).  Plaintiff provides no support for his position that a DPS witness cannot explain, based on his personal work experience, why DPS has designated NGE as a STG.  See Knight Estate of Graham v. City of Fayetteville, 234 F. Supp. 3d 669, 682 (E.D.N.C. 2017) (permitting medical doctor to testify as fact witness about results of autopsy examination and provide report of examination without disclosure as an expert witness).  Where the Rich affidavit simply summarizes (uncontested) NGE documents, addresses DPS's interpretation of the documents, and explains, based on his personal knowledge, DPS's decision to validate NGE as a STG, the court finds the testimony is admissible under Rule 701.  See Perkins, 470 F .3d 155-56; cf. Holt v. Hobbs, 135 S. Ct. 853, 864 (2015) (noting court must give due deference to prison officials' findings regarding security issues when evaluating RLUIPA claims).

As noted, defendants concede the last three sentences of paragraph 17 of the Rich affidavit should be stricken as improper opinion testimony.  The court therefore grants the motion to strike in part, strikes the relevant sentences, and denies the motion in all other respects.  The court will not consider the last three sentences of paragraph 17 for purposes of deciding the instant summary judgment motion.

B.     Motion for Summary Judgment

  1.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one

reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

2.     RLUIPA

In relevant part, RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . ., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).

Under RLUIPA, the plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of his religion. See 42 U.S.C. § 2000cc-2(b); see Miles, 688 Fed. Appx. at 178. The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009). A "'substantial burden' is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, . . . or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted); see also Holt, 135 S. Ct. at 862.

Once the inmate makes a prima facie showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." Smith, 578 F.3d at 250; see Miles, 688 Fed. Appx. at 178-179. "'RLUIPA adopts a ... strict scrutiny' standard." Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (quoting Lovelace, 472 F.3d at 198 n. 8). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quotation omitted); Smith, 578 F.3d at 252 (quotations omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . Rather, due deference will be afforded to those explanations that sufficiently 'take[ ] into account any institutional need to maintain good order, security, and discipline.'" Couch, 679 F.3d at 201 (quoting Lovelace, 472 F.3d at 190); see also Holt, 135 S. Ct. at 866.

3. Analysis

Plaintiff moves for summary judgment on each element of his RLUIPA claim. As noted, plaintiff bears the burden of establishing that his fasting request is a "religious exercise" protected by RLUIPA. Although RLUIPA defines "religious exercise" to include "any exercise of religion" the statute does not define the term religion. See 42 U.S.C. § 2000cc-5(7)(A).

Determining whether a particular belief system qualifies as a religion is "a most delicate question." Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972). Plaintiff must demonstrate that the his beliefs are: 1) sincerely held; and 2) religious in nature under plaintiff's "scheme of things." United States v. Seeger, 380 U.S. 163, 185 (1965); Moore-King v. Cty. of Chesterfield, Va., 708

15

F.3d 560, 570–71 (4th Cir. 2013), abrogated on other grounds by Nat'l Inst. of Family & Life Advocates v. Becerra, 138 S. Ct. 2361 (2018).

Beginning with the second prong, whether the beliefs are "religious in nature" the court must determine whether plaintiff's beliefs "occupy a place in [his] life 'parallel to that filled by orthodox belief in God.'" Moore-King, 708 F.3d at 571 (quoting Seeger, 380 U.S. at 166). The beliefs "must . . . amount to a religious faith as opposed to a way of life." Id. (citing Wisconsin v. Yoder, 406 U.S. 205, 215 (1972)). A belief system that reflects "personal and philosophical choices" and "not deep religious convictions shared by an organized group" does not qualify as a religion. Id.

Here, the parties are in sharp disagreement about whether NGE qualifies as a religion or a secular hate group. Accepting defendants' evidence as true and drawing all reasonable inferences in their favor, the court concludes a genuine issue of material fact exists as to whether NGE qualifies for religious protection under the Constitution. As defendants emphasize, NGE's own materials state they are "not a religion" but a "way of life" and that "God" is the "Asiatic black man, who's rightful name is Allah." (Rich Aff. (DE 139-4) ¶ 5; Rich Aff., Ex. D (DE 140-2)). Where NGE's own materials describe it as a "way of life" and state it is "not a religion," the court agrees with defendants that this creates a factual issue on the question of whether NGE qualifies as a religion. See Yoder, 406 U.S. at 215 (secular "way of life" is not a religion deserving of constitutional protection).

Defendants have also submitted evidence suggesting NGE teaches racial supremacy and directs adherents to murder Caucasians. (Rich Aff., Ex. F (DE 140-4) at 6). According to defendants, NGE also is affiliated with the UBN, a violent street gang, of which plaintiff himself is a validated member. (Dunston Aff. (DE 58) ¶¶ 7-9, 16-17). Based on this evidence, DPS has

16

determined that NGE is a black supremacist group that openly advocates violence against Caucasians. (Rich Aff. (DE 140-4) ¶¶ 4-16). Assuming defendants' evidence is true, the court agrees that a group whose organizing principle teaches racial supremacy of black men, that disclaims any references to itself as a "religion," and advocates racial violence would not "occupy a place in [the plaintiff's] life 'parallel to that filled by orthodox belief in God.'" Moore-King, 708 F.3d at 571; see also Versatile v. Johnson, No. 3:09CV120, 2011 WL 5119259, at *17 (E.D. Va. Oct. 27, 2011) (concluding NGE did not qualify as a religion where plaintiff's evidence failed to show "a unifying comprehensive set of beliefs about ultimate matters" or a "universal moral or ethical code"), aff'd, 474 F. Appx 385 (4th Cir. 2012).

The court recognizes plaintiff has submitted evidence disputing defendants' claims that NGE does not qualify as a religion. As noted, Horn's expert report states that NGE texts "speak[] to the ultimate questions of human existence and life and occupies a place in the hearts, minds, and lives of its adherents akin to that filled by orthodox belief in God in more mainstream religions." (Horn Report (DE 130-1) at 6). Plaintiff also has testified that his beliefs occupy a place in his life similar to orthodox religion. (Pl.'s Decl. (DE 130-4) ¶¶ 4, 11, 13). This evidence creates a genuine issue of material fact as to whether NGE deserves constitutional protection as a religion, resolution of which must be left to the factfinder. See Anderson, 477 U.S. at 247–48; see also Coward v. Robinson, 276 F. Supp. 3d 544, 567 (E.D. Va. Aug. 28, 2017) (determining NGE qualifies as a religion only after conducting bench trial to resolve factual disputes).

Defendants also assert there is a genuine issue of material fact with respect to whether plaintiff sincerely holds beliefs in NGE, which is also required to establish that NGE qualifies as a religion in this action. See Moore-King, 708 F.3d at 571. Plaintiff and his expert describe NGE

17

is a nonviolent belief system that "expressly disclaims gang violence" and that NGE does not "advocate hate, violence, or disruptive behavior." (Horn Report (DE 130-1) at 12; see also Pl's Decl. (DE 130-5) ¶¶ 9-11)). Defendants assert that plaintiff's admitted membership in UBN and history of violent criminal offenses and disciplinary infractions suggest he is not an ardent NGE follower. Plaintiff, however, has testified that he has been an ardent follower of NGE since 2004. (Pl.'s Decl. (DE 130-4) ¶¶ 3). The sincerity of plaintiff's belief is also a matter best left to the factfinder. Anderson, 477 U.S. at 255.

Where the court finds genuine issues of material fact preclude summary judgment on the issue of whether NGE qualifies as a religion, the court does not address the remaining elements of plaintiff's prima facie case or whether defendants have established that prohibiting plaintiff from fasting on NGE holy days is the restrictive means of serving a compelling governmental interest. Under RLUIPA, plaintiff must make a threshold showing that he engaged in a "religious exercise" and that defendants refusal to accommodate that request is a substantial burden on his exercise of "religion." 42 U.S.C. § 2000cc-5(7)(A) (defining religious exercise); Lovelace, 472 F.3d at 186-87. Plaintiff can only make this showing if NGE qualifies as a religion under the standard set forth above. See Moore-King, 708 F.3d at 570-71. Additionally, the burden does not shift to defendants to satisfy strict scrutiny unless plaintiff establishes a prima facie case. Smith, 578 F.3d at 250. The parties therefore can address each element of their respective burdens of proof on plaintiff's RLUIPA claim at the forthcoming trial.

C. Motions to Seal

Defendants move to seal certain exhibits submitted in support of the instant motions for summary judgment that contain highly confidential materials related to DPS policies for

classification of STGs. The public has received adequate notice of the motions to seal. Regarding the documents the parties seek to seal in their entirety, no less drastic alternative to sealing is available because the confidential information appears throughout the filings sought to be sealed. Defendants' interests in maintaining the confidentiality of the records, which contain highly sensitive security policies and related documents, outweighs any public interest in disclosure. Accordingly, the court grants the motions to seal.

D.   Trial Planning

Where plaintiff's RLUIPA claim remains, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial. The parties are DIRECTED to file within 21 days from the date of this order a joint status report informing of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates. The court also requests the parties' position(s) on whether a bench trial is appropriate in these circumstances where the only relief available under RLUIPA is equitable.[4] In addition, the parties shall specify if they wish to schedule a court-hosted settlement conference or additional alternative dispute resolution procedures in advance of trial, and if so the date for completion of such. Upon the parties' report, the court will enter such further order as is warranted regarding pretrial and trial scheduling.

**CONCLUSION**

Based on the foregoing, the court DENIES plaintiff's motions for summary judgment (DE 127) and GRANTS in part and DENIES in part plaintiff's motion to strike (DE 145). The court also

---

[4] See Skippy, Inc. v. CPC Intern. Inc., 674 F.2d 209, 215 (4th Cir.1982) (explaining that where claims for damages were previously dismissed and "the case presented issues purely equitable in nature" the court may resolve the claim without empaneling a jury); see also Thunderhorse v. Pierce, 364 F. App'x 141, 148 (5th Cir. 2010) (plaintiff not entitled to jury trial in RLUIPA action).

GRANTS defendants' motions to seal (DE 133, 141) and DIRECTS the clerk to maintain docket entries 131 and 140 under seal until further order of the court.  The parties are DIRECTED to file status reporting regarding pretrial and trial activities as set forth herein within **21 days** of entry of this order.

      SO ORDERED, this the 30th day of September, 2019.

                                              LOUISE W. FLANAGAN
                                              United States District Judge